UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JENNIFER ROBINSON**,                    Case Number 1:13 CV 2536

     Plaintiff,                    Judge Benita Y. Pearson

     v.                    REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

     Defendant.                    Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Jennifer Robinson filed a Complaint (Doc. 1) against Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1) (Non-document entry dated November 15, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

On March 12, 2010, Plaintiff filed for DIB and SSI benefits alleging disability since September 13, 2000. (Tr. 124-134). Plaintiff's claims were denied initially (Tr. 57-58) and on reconsideration (Tr. 59-60).  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 84-85).   On April 4, 2012, Plaintiff (represented by counsel) and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 10, 25-26). On September 19, 2013 the Appeals Council denied Plaintiff's request

for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On November 15, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Personal and Vocational History

Plaintiff was 33 years old at the time of the ALJ hearing. (Tr. 25-26, 124). Plaintiff testified she only completed school through the eighth or ninth grade[1]. (Tr. 27). She has past relevant work experience as a home health aide, mail handler, general laborer, cashier, and tax clerk. (Tr. 181).

In March 2010, Plaintiff lived independently with her two children, helped her children get ready for school, cared for her own personal grooming and hygiene except she required her daughter's assistance to comb her hair, cleaned up, and shopped with her daughter's assistance. (Tr. 193-99). Plaintiff's seventeen-year-old daughter prepared meals and handled money. (Tr. 193-99). As of April 2012, Plaintiff could get her son ready for school and make sure he took his medication, perform grooming and hygiene with the assistance of her adult daughter, and perform household chores with the assistance of both her children. (Tr. 32-33, 43). Plaintiff spent her days watching television and was able to prepare some meals without assistance. (Tr. 32-33).

### Medical Evidence

A large portion of Plaintiff's medical record describes treatments for health conditions unrelated to Plaintiff's alleged impairments. Since Plaintiff does not allege any physical impairments aside from blindness, only records regarding this or Plaintiff's mental impairments

---

1. Plaintiff's high school record reveals she attended ninth grade and some of tenth grade. (Tr. 262). She dropped out of school at age fourteen to have a baby. (Tr. 413).

are discussed herein. *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver).

Plaintiff's medical history revealed she had right eye blindness due to a childhood injury. (Tr. 286, 288, 296, 304, 321, 350, 352, 361, 373, 388, 393, 492). In July 2003, Plaintiff saw Dr. Joseph Labastille complaining of redness and purulent discharge in her right eye. (Tr. 321). Plaintiff's right pupil was non-reactive and her eye movements were intact. (Tr. 321). Dr. Labastille diagnosed conjunctivitis and prescribed garamycin drops. (Tr. 321).

On January 17, 2011, Plaintiff saw William Roscoe, D.O., for headaches with a pain level of seven on a ten-point scale, trouble staying out in daylight, and worsening vision in her left eye to the point that she was seeing double at times although she described her left eye vision as "stable". (Tr. 390). Dr. Roscoe said Plaintiff's left eye vision was "20/40 for no apparent reason." (Tr. 390). He prescribed eye drops and prescription lenses and recommended a recheck in six months to see if a vision field test was necessary. (Tr. 390).

After the ALJ hearing, on September 14, 2012, Dr. Stephen Figler evaluated Plaintiff and found she had no visual acuity in the right eye and visual acuity of 20/40 in the left eye with weakness and unexplained vision field loss. (Tr. 531).

In terms of Plaintiff's mental health treatment, Plaintiff saw Bernadette A. Bogdas, R.N., C.P.N., at BWY Family Practice for an unrelated issue in August 2004 and stated she had been experiencing relationship problems, stress, some insomnia, decreased appetite, excessive crying without cause, and feeling overwhelmed.  (Tr. 310). Plaintiff reported suicidal thoughts and a history of attempted suicide. (Tr. 310). Nurse Bogdas diagnosed depression, prescribed Lexapro, and referred Plaintiff to the mental health department with an urgent status. (Tr. 311).

On April 2, 2012, Plaintiff saw Gaby El-Khoury, M.D., complaining of chronic headaches over the prior two months, depression, and stress. (Tr. 522). Plaintiff said she shook constantly, cried at times, felt sad and lonely, and ate poorly although she slept well. (Tr. 522). Plaintiff said she had considered overdosing or drowning herself and that she heard voices telling her to harm herself or others but she had no plans to harm others and she wanted to live for her kids. (Tr. 522). Plaintiff reported smoking a pack-a-day, drinking beer and liquor, and using marijuana. (Tr. 522). Dr. El-Khoury diagnosed headache, depressive disorder, and vision disorder. (Tr. 523).

***State Agency Review and Examination***

On August 24, 2010, Plaintiff underwent an ophthalmic consultative examination with Harvey Lester, M.D. (Tr. 404-407). Dr. Lester found Plaintiff had no vision in her right eye and had vision of 20/100 with correction in her left eye. (Tr. 405). In a May 2011 clarifying letter and subsequent June 2011 letter, Dr. Lester explained Plaintiff had an amblyopic[2] left eye since early childhood and a childhood injury involving scissors caused injury to Plaintiff's dominant, right eye. (Tr. 431, 450).

On September 13, 2010, state agency reviewing physician, Jerda Riley, M.D., reviewed Plaintiff's medical records including Dr. Lester's report and indicated the medical evidence of record was insufficient because there was no objective physical evidence of pathology to conclude the left eye had been amblyopic since childhood. (Tr. 408). However, there was

---

2. Amblyopia, commonly referred to as "lazy eye", is a condition in children where vision does not properly develop in one eye, usually causing one eye to have much less focus than the other. If left untreated, the vision impairment will become permanent as the child's brain matures. *Amblyopia and Your Child's Eyes*, http://www.webmd.com/eye-health/amblyopia-child-eyes (accessed 12/30/14).

obvious pathology for Plaintiff's right eye injury and thus sufficient evidence to determine the credibility and severity of that injury. (Tr. 408).

Consultative Examiner David House Ph.D., examined Plaintiff on January 25, 2011. (Tr. 412-20). Plaintiff had recently been charged with domestic violence and was a frequent marijuana user who regularly drank alcohol and complained of episodes of blackouts and vomiting. (Tr. 414). Plaintiff complained of headaches which led to "outbursts" and she denied ever being prescribed psychotropic medication but indicated she wished she had been prescribed some. (Tr. 414). On mental status exam, Plaintiff's grooming and hygiene were fair; however Plaintiff was disorganized in manner and complained of headaches. (Tr. 414). Dr. House opined Plaintiff was "impulsive with low motivation". (Tr. 414). Dr. House noted loose associations and tangentiality in Plaintiff's speech which was understandable despite poverty of content. (Tr. 415). With regard to mood, Plaintiff maintained adequate eye contact throughout the examination however Plaintiff said she slept "very little", had an appetite so low she could go three days without food, experienced depression for "a long time", and had crying episodes twice per day. (Tr. 415).  Plaintiff said she had suicidal thoughts but had never attempted suicide. (Tr. 415). At first, Plaintiff told Dr. House she did not have a lot of anxiety but then said she had lots of "panic" and regarding compulsivity, said she counted everything in the house. (Tr. 415). Dr. House said Plaintiff had post-traumatic stress issues stemming from abuse by an adult cousin at age seven and that Plaintiff was experiencing depersonalization in that she felt she was being watched all the time. (Tr. 415). Dr. House elicited some delusional material during the interview and Plaintiff revealed she heard voices, which could have been substance induced. (Tr. 416).

Dr. House administered an IQ test which revealed Plaintiff had a full scale IQ of 59. (Tr. 417). Dr. House diagnosed posttraumatic stress disorder ("PTSD"), obsessive compulsive

disorder ("OCD"), polysubstance dependence, cannabis intoxication, polysubstance induced psychotic process with hallucinations, and nicotine dependence. (Tr. 418). Dr. House opined Plaintiff's ability to maintain concentration, persistence, and pace was markedly limited; her ability to understand, remember, and follow instructions was moderately limited; her ability to withstand stress and pressure of day to day work was markedly limited; her ability to relate to others including supervisors and co-workers was markedly limited; her adaptability, insight, and judgment were markedly limited. (Tr. 418). Dr. House opined this was due to some emotional factors but also due to cannabis intoxication. (Tr. 418). Dr. House assigned a Global Assessment of Functioning ("GAF") score of 30.[3] (Tr. 419).

On May 20, 2011, Plaintiff underwent a psychological consultative exam with J. Joseph Konieczny, Ph.D. (Tr. 422-28). Plaintiff reported a history of heavy and problematic use of alcohol and admitted to continued drinking as well as smoking a pack-a-day but denied any other drug use. (Tr. 423). On exam, Plaintiff spoke reasonably well with a greater level of speech than would be anticipated given the results of intellectual testing. (Tr. 423). Plaintiff's level of motivation throughout the examination seemed questionable and was reflective of her presentation. (Tr. 423). She had no looseness of associations, tangentiality or poverty of speech in conversation. (Tr. 423). No delusional material was elicited during the interview session and although Plaintiff reported she had heard voices her whole life and was hearing them during the

---

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score between 21-30 indicates behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). *DSM-IV-TR* at 34.

interview, she gave no indication she was responding to internal stimuli. (Tr. 424). Plaintiff's mental status exam was otherwise unchanged from Dr. House's examination.

An IQ test administered by Dr. Konieczny's assistant revealed a full scale IQ of 60. (Tr. 422, 425). Dr. Konieczny opined that given Plaintiff's apparent level of adaptive functioning, her true level of intellectual functioning was likely in the borderline range. (Tr. 425). Dr. Konieczy opined Plaintiff had no impairment in her ability to concentrate and attend to task; moderate impairment in ability to understand and follow directions and awareness of social judgment and conformity; marked impairment in her ability to withstand stress and pressure and relate to others and in her overall judgment. Dr. Konieczny diagnosed Plaintiff with borderline intellectual functioning and personality disorder not otherwise specified, and assigned a GAF score of 48.[4] (Tr. 425-26).

On January 3, 2011, state agency reviewing physician Walter Holbrook, M.D., reviewed Plaintiff's file and opined that because claimant had a retinal injury during childhood to her right eye which left her with no light perception and because her vision in her left eye in 2008 was 20/100 best correction, she met the standard for listing 2.02.[5](Tr. 410).

State agency reviewing physician Frank Orosz, Ph.D., reviewed Plaintiff's file on June 5, 2011. (Tr. 432-48). Dr. Orosz indicated Plaintiff had moderate restriction of her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 442). Plaintiff had not had any episodes of decompensation of extended duration. (Tr. 442). Dr. Orosz noted Plaintiff was sent to a second psychiatric evaluation because she was drunk at

---

4. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34. *DSM-IV-TR*, at 34.
5. The Commissioner notes in his brief that Dr. Holbrook does not cite to the medical evidence he relied on in making this assessment. (Doc. 19, at 8).

the first one, claimed to have been in special education but her school records did not so indicate, and a medical expert had opined that Plaintiff's abilities went beyond her IQ of 60. (Tr. 448). Dr. Orosz said Plaintiff was able to understand and recall simple and some more complex instructions, could make simple work judgments and adaptations, and could perform simple and some more complex tasks that were not fast-paced or strictly demanding and that did not require close or constant contact with others,. (Tr. 448).

State agency reviewing physician John Waddell, Ph.D., reviewed Plaintiff's file on June 24, 2011. (Tr. 468). He reported Plaintiff had moderate restriction in daily activities, moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 462). Dr. Waddell opined Plaintiff "performs less than she is capable of," noting although Plaintiff could walk to the store, cook, and clean, she had others do these things for her. (Tr. 469). Dr. Waddell said it seemed Plaintiff was often intoxicated and this would affect her concentration and task completion. (Tr. 469). Dr. Waddell opined that with abstinence Plaintiff would have the capacity to complete a variety of simple tasks. (Tr. 469).

On October 18, 2011 Dr. Waddell completed another assessment which replaced the June 2011 assessments of Drs. Waddell and Orosz. (Tr. 482). Dr. Waddell indicated Dr. House's January 25, 2011 and Dr. Konieczny's May 20, 2011 consultative examination reports must be disregarded due to the report of the Cooperative Disability Investigations Unit ("CDIU"). (Tr. 482). Dr. Waddell indicated Plaintiff had mild restriction of her activities of daily living and found insufficient evidence to determine her ability to maintain social functioning or maintain concentration, persistence, or pace. (Tr. 480).

Also on October 18, 2011, Teresita Cruz, M.D., completed an updated physical analysis of Plaintiff's claim. (Tr. 484). Dr. Cruz indicated that Dr. Lester's August 24, 2010 ophthalmic consultative examination was disregarded in light of the CDIU report and found insufficient evidence to determine Plaintiff's visual function. (Tr. 484).

### CDIU Report

On July 12, 2011 the Cleveland CDIU opened an investigation into Plaintiff's request for reconsideration as the result of fraud or similar fault[6] identified by the Ohio Disability Determination Service ("DDS"). (Tr. 237). Specifically, DDS requested CDIU's assistance in resolving areas of conflict between Plaintiff's statements regarding her limitations and the medical evidence of record. (Tr. 237). On September 28, 2011, two detectives arrived at Plaintiff's apartment and immediately made contact with a female who positively identified herself as Plaintiff. (Tr. 240). The detectives immediately observed that Plaintiff's right eye was impaired, however her left eye appeared functional and Plaintiff was able to make eye contact utilizing her left eye. (Tr. 240). Plaintiff appeared to have no difficulty comprehending or responding to questions posed to her and she made no mention of debilitating headaches or limitations learning or understanding. (Tr. 240). Plaintiff gave the detectives detailed information about her living situation and the detectives learned Plaintiff was able to cook, do laundry, and generally manage all of her personal needs unassisted. (Tr. 241).

---

6.  Similar fault occurs when "(A) an incorrect or incomplete statement that is material to the determination is knowingly made; or (B) information that is material to the determination is knowingly concealed." 42 U.S.C §§ 405(u)(1)(B), 405(u)(2).

On October 17, 2011 a Special Determination was conducted by the state agency regarding the issue of similar fault. (Tr. 249). The state agency provided the following analysis in making its determination:

> The evidence shows intelligence testing performed in 01/2011 and 05/2011 do not provide an accurate score of the claimant's intelligence. Her questionable motivation and drug use were thought to affect her performance. Although the claimant reported receiving special education services in school, special education records were not available. Some consideration should be given to the claimant's past work and her ability to perform semi-skilled work. The claimant reported hearing voices at the psychological consultative examinations; however a review of her medical reports does not indicate any such complaint to her Family Practice Care provider or during Emergency Room treatment. Medical evidence shows the claimant had a recent eye examination performed in 01/2011, where vision in the left eye was corrected to 20/40. The claimant attended two different psychological consultative examinations in 2011. These reports do not indicate problems with seeing and the claimant completed intelligence testing without any reports of difficulty seeing the test materials. Evidence shows the claimant is able to do normal daily activities like cooking, doing laundry, leaving her home on a daily basis to visit friends and neighbors, running errands, going to the grocery store and occasionally using the computer.

(Tr. 251).

Based on this report and preponderance of the evidence, the Agency found "there is reason to believe that the claimant knowingly concealed and provided incorrect information concerning her intelligence, her vision and her ability to function on a daily basis. The claimant has committed similar fault in connection with her disability claim." (Tr. 251). Due to the finding of similar fault, information provided by Plaintiff as well as the ophthalmological and psychological consultative examinations were disregarded. (Tr. 251).

***VE Testimony***

VE Ted Macy testified at the hearing before the ALJ. (Tr. 44-51). The ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who could lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand, and walk six out of eight hours a day,

push, pull, or foot petal use without limitation; can frequently use a ramp or stairs but never a ladder, rope or scaffold; and could not frequently balance, stoop, kneel, crouch, or crawl. (Tr. 46-47). For visual limitations, this person could not see in their right eye and had functional limits in their left eye with limited depth perception and a limited field of vision. (Tr. 47). Further, this person should avoid unprotected heights, complex tasks, and have no stress, no high production quotas, piece rate work, or work involving arbitration, negotiation, or concentration. (Tr. 47). Contact with the general public must be short in duration and for a specified purpose. (Tr. 47). The VE said such a person could find work as a mail handler, the job Plaintiff most recently performed, or a number of other jobs including laundry worker, wire worker, or electronics worker. (Tr. 47-48). Next, the ALJ asked the VE about a second hypothetical person who had the same limitations as the first but could not have contact with the public, was off task twenty percent of the time, and would miss five days of work per month. (Tr. 48-49). The VE responded that there were no competitive jobs available for such a person. (Tr. 49).

Plaintiff's attorney asked the VE about a third hypothetical person, who had all of the same limits as the first hypothetical person except this person would black out twice a week. (Tr. 49). The VE responded that if this were to happen during working hours, this would not be acceptable to employers and Plaintiff would likely be replaced. (Tr. 49-50). Plaintiff's attorney further asked the VE whether Plaintiff's right-eye blindness would pose a hazard to her in any of the jobs she could do in hypothetical one considering the machinery and people she would have to be around. (Tr. 50). The VE responded that this machinery was not dangerous and that a lot of people worked in these jobs with monocular vision. (Tr. 50). The attorney then asked what would happen if Plaintiff's depression caused her to miss two days of work a month. (Tr. 50).

The VE responded that over time this would become unacceptable to most employers and Plaintiff would be replaced. (Tr. 50-51).

***ALJ Decision***

On July 10, 2012, the ALJ found that although Plaintiff had briefly engaged in substantial gainful activity, "most of this work activity did not rise to the level of substantial gainful employment". (Tr. 12). Next, the ALJ found Plaintiff had the severe impairments of right eye blindness, personality disorder, and borderline intellectual functioning. (Tr. 13). The ALJ found that these impairments considered singly and in combination did not meet or medically equal a listing. (Tr. 13). The ALJ found Plaintiff had only moderate restriction in her activities of daily living, moderate difficulties with social functioning, and moderate difficulties with concentration, persistence, or pace. (Tr. 13-14). With respect to Plaintiff's mental limitations, the ALJ found Plaintiff had not met the "paragraph B" criteria of having a full scale IQ of 59 or less because although Plaintiff had scored a 59 on an IQ test, the psychological examiner did not believe this score was valid since Plaintiff had been abusing substances that day. (Tr. 14). Similarly, Plaintiff did not meet "paragraph C" criteria of having an IQ between 60 and 70 coupled with another physical or mental impairment that imposed a significant work restriction because although Plaintiff had achieved an IQ score of 60, the psychological consultative examiner who performed the test believed this was an underestimate of Plaintiff's ability and that her true ability lied in the borderline range. (Tr. 14-15).

The ALJ found Plaintiff had the RFC to perform medium work as defined in 20 CFR §§ 404.1567 (c) and 416.967(c). (Tr. 15). Plaintiff was limited in that she could never climb ropes, ladders, or scaffolds, and should avoid unprotected heights. (Tr. 15). She could perform simple, routine tasks, which were low stress, without high production quotas, piece rate work, or work

12

involving arbitration, confrontation, and negotiation. (Tr. 15). Plaintiff should have only superficial interaction with the general public for a specific purpose or short duration. (Tr. 15). She had no visual acuity and color vision in her right eye and had functional limitations in her left, and she had limited depth perception and a limited field of vision. (Tr. 15). In making this determination, the ALJ found sufficient evidence to evaluate Plaintiff's vision and mental condition and considered but applied limited or no weight to the opinions the State Agency had ruled were to be disregarded. (Tr. 16-17). The ALJ found based on VE testimony, that a significant number of jobs existed in the national economy that a person with Plaintiff's background and RFC could perform, therefore Plaintiff was not disabled. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

14

## DISCUSSION

In her brief on the merits, Plaintiff raises the following assignments of error:

1. Does substantial evidence support the ALJ's finding No. 4 wherein he concluded the Plaintiff did not meet or equal Listings: 2.02, 2.04, 12.05( C), (D), or 12.06, or 12.08? In other words, did the ALJ err by failing to resolve conflicting medical evidence, and failing to fully evaluate the record as a whole; and improperly discounting or excluding the medical reports of Doctors: Konieczny, Waddell, Lester, Walter Holbrook, and Cruz [Tr. 13-15]?

2. Did the ALJ err in making Finding No. 5 in which he concluded the Plaintiff had the residual functional capacity to perform medium level work with some restrictions, because he erred in Finding No. 9, when he mistakenly concluded Plaintiff had a least a high school education [Tr. 17]; and because he failed to add additional limits to her performance capabilities based upon his finding NO. 3 where he stated she had three severe impairments [Tr.13,15]?

3. Did the ALJ err in making Finding No. 10 in which he concluded that there were other jobs in the U.S. economy that Ms. Robinson could perform; and did he also err in making Finding No. 11, in which he concluded that Ms. Robinson was not under a disability as defined in the Social Security Act from September 13, 2000 through the date of his decision on July 10, 2012( Tr.17-18]?

4. Did the SSA agency doctors Cruz and Waddell err in excluding the medical evidence of doctors Holbrook, Lester, House, and Konieczny based upon the evidence contained in the record as a whole [Tr. 480,482, 484]?

5. Considering the record as a whole, was there sufficient probative medical evidence remaining after the State Agency doctors Cruz and Waddell excluded the medical findings of Dr Lester and Holbrook regarding plaintiff's eye impairments, and Dr.'s House and Konieczny regarding Plaintiff's mental impairments for the ALJ to use to make his findings No. 4, 5, 10, and 11 [Tr. 13, 15,17-18]?

6. Did the Special Investigators sent to interview Ms. Robinson on September 28, 2011 in fact interview the Plaintiff, as they thought, or in actuality interview an impostor [Tr.235-244, see the affidavit of the Plaintiff attached hereto as Exb. "A"]; if they interviewed the wrong person, did the ALJ and SSA officials err in relying on their reports to exclude the reports of Doctors Walter Holbrook, Lester, House, and Konieczny?

(Doc. 16, at 2-3).

15

*Validity of the CDIU Report and the Decision to Disregard Evidence*

Since all of Plaintiff's arguments relate in some way to the CDIU report, this Court first addresses the report's validity. Plaintiff argues the CDIU report should not have been relied upon by the Social Security Administration ("SSA") in making its finding of similar fault because it was not Plaintiff who was interviewed by the detectives, but rather an imposter. (Doc. 16, at 3; Doc. 16-1 at 5-6).

In support, Plaintiff provides this Court with her own sworn affidavit asserting she was never interviewed by SSA detectives, the photograph contained in the report is not a photograph of her, and in fact she cannot do many chores around the house, seldom leaves her apartment and does not go outside, and has never used a computer. (Doc. 16, at 8-9). There is no indication that this affidavit was ever provided to SSA during its proceedings, and Plaintiff never raised the issue of her not being the person interviewed by CDIU detectives before the ALJ or at any earlier point during the SSA's proceedings. Further, Plaintiff does not offer legal authority in support of her argument, which this Court construes as a request for a sentence six remand.

When evidence not before the ALJ is submitted to the reviewing court, the court may issue what is known as a sentence six remand. Under sentence six of 42 U.S.C. § 405(g), the district court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits"); *see also*, *Anthony v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 180708, at *6-8 (N.D. Ohio). If a sentence six remand is ordered, the district court retains jurisdiction while the matter is remanded to the social security administration for further proceedings; it is not a final judgment

16

that can be appealed. *Melkonyan*, 501 U.S. 89; *Cross*, 373 F. Supp. 2d 724; *Wasik v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 18106 (E.D. Mich.).

A claimant must establish two prerequisites before a district court may order a sentence six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2001). A claimant must show: (1) the evidence at issue is both "new" and "material"; and (2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). The party seeking remand bears the burden of showing these two requirements are met. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Here, Plaintiff had notice of the CDIU report, received as an Exhibit without objection, and would have known at the time of the hearing whether she was the person interviewed by the CDIU detectives. Plaintiff has not provided good cause for her failure to raise this issue during the prior proceeding and there appears to be no reason why she could not have done so. Because there is no good cause for Plaintiff's failure to raise this issue at the hearing, a sentence six remand is not appropriate and this Court does not need to address whether this evidence is new or material. Since the ALJ did not have any evidence to the contrary before him, he had no reason to believe Plaintiff was not the person interviewed by CDIU detectives, and hence the ALJ's conclusion to that effect is supported by substantial evidence.

Plaintiff further argues even if the detectives had interviewed the right person, the CDIU report did not contain sufficient evidence to justify the exclusion of other medical reports and the findings the doctors made in the excluded medical reports are supported by the medical evidence of record and Plaintiff's own testimony. (Doc. 16, at 3, 32). Plaintiff raises essentially the same issue in her 4th assignment of error when she asks if Drs. Cruz and Waddell, who excluded this

evidence in their reports based on the Special Determination, erred in excluding this evidence based on the record as a whole. (Doc. 16, at 3). The Court construes Plaintiff's argument to mean the ALJ erred by relying on the state agency finding that similar fault was involved, and thereby disregarding information provided by Plaintiff and reports based on full input from Plaintiff such as her August 24, 2010 ophthalmological consultative examination, and her January 25, 2011 and May 20, 2011 psychological consultative examinations. (Tr. 251).

The Social Security Act provides that when making an initial determination of entitlement to disability benefits, "the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." Similar fault occurs when "(A) an incorrect or incomplete statement that is material to the determination is knowingly made; or (B) information that is material to the determination is knowingly concealed." 42 U.S.C §§ 405(u)(1)(B), 405(u)(2). The Court reviews this finding as it does all other findings of fact by the Commissioner, to determine if it is supported by substantial evidence.[7] *Walters*, 127 F.3d at 528.

In finding similar fault had occurred, the ALJ considered the record as a whole and not the CDIU report alone, hence Plaintiff's argument that the CDIU report itself did not contain enough evidence to support a finding of similar fault is not relevant, what is relevant is whether the agency's finding as a whole is supported by substantial evidence. In relying on the Special Determination the ALJ considered the following: during intelligence testing, the examining psychologists indicated that drug use or a lack of motivation impacted Plaintiff's performance;

---

7. The Court notes SSR 00-02P provides that a finding of similar fault must be made by a preponderance of evidence. SSR 00-02P at *2 (2000). This Court is not bound by Social Security Rulings and importantly, Congress has provided that substantial evidence is the appropriate standard of review for all findings of fact by the Commissioner, therefore it is the standard applied here. 42 U.S.C. § 405 (g).

although Plaintiff reported receiving special education services in school, no supportive records were available; Plaintiff had performed semi-skilled work in the past despite claiming intellectual disability; although Plaintiff reported hearing voices, her medical reports did not indicate she had ever complained of it to her family care provider or during emergency room treatment; and although Dr. Lester found Plaintiff had 20/100 vision in her left eye, Dr. Roscoe more recently found Plaintiff had 20/40 vision in her left eye and examination reports did not indicate Plaintiff had trouble seeing materials during intelligence testing. (Tr. 251, 390, 416, 405, 423). The ALJ only then turned to the CDIU report for evidence that contrary to Plaintiff's reports of needing assistance to live, evidence showed Plaintiff was able to complete normal daily activities and leave the house on a daily basis to visit friends and neighbors. (Tr. 241, 251). Therefore, substantial evidence supports the ALJ's finding of similar fault and Plaintiff's assignment of error is without merit.

### Duty to Develop the Record

Plaintiff argues once the medical findings of Drs. Lester and Holbrook and mental impairment findings of Drs. House and Konieczny were excluded, the ALJ lacked sufficient probative evidence to find Plaintiff not disabled. (Doc. 16, at 3). Specifically, Plaintiff argues her claim should have been referred back to the state agency to conduct an additional eye exam and psychological exam to resolve the conflicting findings. (Doc. 16-1, at 5-6).

Plaintiff is correct; an ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) ("The social security hearing examiner furthermore does not act as counsel. He acts as an examiner charged with developing the facts.") (citing *Richardson v. Pearles*, 402 U.S. 389, 410 (1971)); *See also*, *Heckler v. Campbell*, 461 U.S. 458,

470 (1983). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability). The Sixth Circuit has emphasized this duty when a claimant is acting *pro se*. *See Lashley*, 708 F.2d at 1051.

Here, Plaintiff was represented by counsel, not acting *pro se*. The ALJ specifically gave Plaintiff's counsel the opportunity to supplement the record with any additional evidence he felt necessary to prove Plaintiff's disability. At the administrative hearing, the ALJ asked Plaintiff's counsel whether he had any additional evidence to proffer. (Tr. 26). Plaintiff's counsel responded by requesting additional time to produce notes from Plaintiff's most recent psychological visit and this request was granted. (Tr. 26-27). Plaintiff's counsel did not offer any additional exhibits or ask for more time to produce additional evidence nor did he object to any of the exhibits presented. (Tr. 26-27).

Plaintiff asserts the ALJ failed to develop the record because, after Plaintiff's consultative examinations were excluded in accordance with agency records, agency doctors indicated there was no longer enough information to assess Plaintiff's claims. (Doc. 16-1, at 5-6). However, the Social Security Act provides that if, after the exclusion of evidence due to a finding of similar fault, "the Commissioner of Social Security determines that there is insufficient evidence to support such entitlement, the Commissioner may terminate such entitlement". 42 U.S.C. § 405(u)(3). The Commissioner is not required to gather additional evidence to replace the evidence being disregarded, the burden is on Plaintiff to produce additional evidence. *Landsaw*,

803 F.2d at 214.  Therefore, there was sufficient evidence in the record for the ALJ to make a determination and Plaintiff's assignment of error is without merit.

### Listings 2.02, 2.04, 12.05(C), (D), 12.06, 12.08

In Plaintiff's first assignment of error, she argues the ALJ erred in concluding she did not meet or equal listings 2.02, 2.04, 12.05(C) and (D), 12.06, and 12.08. (Doc. 16, at 2). Plaintiff contends with respect to her vision limitations (listings 2.02 and 2.04), the ALJ erred in discounting or excluding the opinions of Drs. Holbrook, Lester and Cruz or in the alternative, there was insufficient evidence to determine the extent of Plaintiff's vision impairments. (Doc. 16, at 2, 20-22). With respect her mental impairments (listings 12.05(C), (D), 12.06, 12.08), Plaintiff contends the ALJ erred in discounting or excluding the opinions of Drs. Waddell, Konieczny, and House or alternatively that there was insufficient evidence in the case file to evaluate Plaintiff's mental impairments. (Doc.16, at 2, 22-27; Doc. 16-1, at 1). Additionally, Plaintiff argues it was error for the ALJ not to find Plaintiff met listing 12.05 (C) or (D) because the record as a whole consistently shows Plaintiff's full scale IQ is between 60-70. (Doc. 16, at 22-25).

As discussed above, the ALJ had sufficient evidence to make a disability determination. As such, only Plaintiff's arguments that she actually met one of the listing impairments or that the ALJ erred in evaluating the opinions of the physicians and psychologists will be discussed.

The listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard, such that their impairments would prevent them from performing any gainful activity – not just substantial gainful activity – regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); Social Security Rule ("SSR") 83-19, at 90)). The

21

listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes medical criteria, and to qualify for benefits under a listing, a claimant must prove her impairment satisfies all the listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530.

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Visual Listings 2.02, 2.04

Plaintiff argues she met or equaled listing 2.02 or 2.04. (Doc. 16, at 20-22). Specifically, Plaintiff argues both listings were met based upon Drs. Lester and Holbrook's finding that Plaintiff had 20/100 vision with best correction. (Doc. 16, at 20).

Listing 2.02 requires "[l]oss of central visual acuity" and "[r]emaining vision in the better eye after best correction is 20/200 or less." 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.02. Listing 2.04 requires "(A) a visual efficiency percentage of 20 or less after best correction OR (B) a visual impairment value of 1.00 or greater after best correction." *Id.* at § 2.04

The ALJ disregarded the vision scores provided by consultative examiners Drs. Lester and Holbrook because of the Special Determination by the agency that similar fault had

occurred. (Tr. 16). This Determination found that Plaintiff had knowingly concealed and provided incorrect information concerning her intelligence, her vision, and her ability to function on a daily basis. (Tr. 251). Medical evidence demonstrated that Plaintiff's left eye vision had been 20/40 with best correction months after Dr. Lester had found Plaintiff's vision was 20/100 at the state agency consultative exam. (Tr. 251, 405). Further, Plaintiff had not had difficulty seeing testing materials during her intelligence tests. (Tr. 251).

Once the evidence supplied by Plaintiff was disregarded based upon the finding that Plaintiff knowingly concealed and provided false information in connection with her claim, the evidence showed Plaintiff had a vision score of 20/40 in her left eye and was able to see well enough to read the questions on her IQ test, thus substantial evidence did not support a finding that Plaintiff met the requirements of listings 2.02 and 2.04. (Tr. 251, 405). Moreover, even if there had been no finding of similar fault, the fact Plaintiff subsequently and inexplicably scored much better on her eye exam provides substantial evidence for determining Plaintiff had better vision than Dr. Lester found during his exam and Plaintiff's argument is without merit.

Listing 12.05 (C) and (D) Intellectual Disability

Next, Plaintiff argues the ALJ erred in finding she had not met the requirements of Listing 12.05 (C) or (D).

Listing 12.05 is for intellectual disability, which is defined as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. pt. 404, subpt. P, app. 1. § 12.05. In order to qualify for a §12.05 listing, a claimant's condition must meet this initial definition, and then must meet the requirements for either subsection (A), (B), (C), or (D). 20 C.F.R. pt. 404, subpt. P, app. 1.

Pertinent here, §12.05 (C) requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function". 20 C.F.R. pt. 404, subpt. P, app. 1, §12.05 (C). Section (D) requires "a valid verbal, performance, or full scale  IQ of 60 through 70, resulting in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1.§ 12.05 (D).

Here, the ALJ discounted IQ testing by the psychologists because both of them had indicated their tests likely did not provide an actual assessment of Plaintiff's abilities because of potential drug use during the first test administration and a lack of motivation during the second. (Tr. 418, 423-425). Further, Plaintiff had been able to perform semi-skilled work, and despite claiming to have been involved in special education classes in school, Plaintiff had been unable to provide a record of this. (Tr. 251).

Plaintiff argues specifically that the ALJ should have found Plaintiff had a full scale IQ between 60 and 70 because Plaintiff scored 60 on an IQ test with Dr. Konieczny, and this was consistent with her IQ score of 59 on her test with Dr. House, and Dr. Konieczny had only stated that this IQ score was a, "slight underestimation of her capability." (Doc. 16, at 24). Plaintiff argues this would still place her in the borderline range and that the ALJ was required to give greater weight to Dr. Konieczny's opinion because 20 C.F.R. § 416.927(c)(2) states that the "more consistent an opinion is with the record as a whole, the more weight we will give that opinion." However, the record also consistently indicates that Plaintiff is not trying her best on the tests she is taking, and thus provides substantial evidence for the ALJ to disregard both of her

IQ scores. (Tr. 405, 416, 418, 425). Once those scores are disregarded, there is no longer any proof Plaintiff has the requisite IQ score. Thus, substantial evidence supports the ALJ's determination that Plaintiff does not meet listing 12.05(C) or (D).

Listings 12.06 Anxiety Disorders

Plaintiff also asserts she meets or equals listing 12.06. (Doc. 16, at 22). Listing 12.06 is for anxiety related disorders. 20 C.F.R. pt. 404, subpt. P, app. 1. § 12.06. In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; by, for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.  Medically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning;
    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4. Recurrent obsessions or compulsions which are a source of marked distress; or

    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

B.  AND resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home

20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.06

    Review of the record reveals little evidence Plaintiff met any of the requirements of this listing. The only symptom Plaintiff had under Part (A) was a diagnosis of obsessive compulsive disorder by Dr. House which could possibly cause obsessions or compulsions. (Tr. 418). However, this diagnosis was not made by any of the other psychologists who examined Plaintiff and Dr. House's opinion was properly disregarded, as discussed above, due to the agency finding that Plaintiff knowingly concealed and provided false information. (Tr. 16). Moreover, Plaintiff was able to perform household chores, run errands, visit friends and neighbors, go to the grocery store, and occasionally use the computer, therefore she did not have the marked restrictions in daily living, maintaining social functioning, or maintaining concentration, persistence, or pace, or episodes of decompensation required under Part (B). (Tr. 251). Further, Plaintiff's ability to run errands and visit friends and neighbors demonstrates the ability to function outside of her home, therefore Plaintiff did not meeting 12.06 (C). In sum, there is little to no evidence Plaintiff suffered from anxiety severe enough to meet listing 12.06 and therefore the ALJ's finding that she did not meet this listing is supported by substantial evidence.

Listing 12.08 Personality Disorders

Listing 12.08 is for personality disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06. A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness. The required level of severity for these disorders is met when the requirements in both A and B are satisfied:

A.  Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

   1. Seclusiveness or autistic thinking; or
   2. Pathologically inappropriate suspiciousness or hostility; or

   3. Oddities of thought, perception, speech and behavior; or

   4. Persistent disturbances of mood or affect; or

   5. Pathological dependence, passivity, or aggressivity; or

   6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B.  Resulting in at least two of the following:

   1.  Marked restriction of activities of daily living; or

   2.  Marked difficulties in maintaining social functioning; or

   3.  Marked difficulties in maintaining concentration, persistence, or pace; or

   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § Pt. 404, Subpt. P, App. 1§ 12.08

Plaintiff was diagnosed with personality disorder only by Drs. House and Konieczny, whose opinions were disregarded based upon the agency finding that Plaintiff knowingly

concealed or provided false information during those exams. (Tr. 251, 418, 425-26). Plaintiff was able to perform household chores, run errands, visit friends and neighbors, go to the grocery store, and occasionally use the computer, therefore she did not have the marked restrictions in daily living, maintaining social functioning, or maintaining concentration, persistence, or pace, nor did she have any episodes of decompensation required under Part (B). Therefore, substantial evidence supports finding Plaintiff did not meet listing 12.08 and Plaintiff's argument is without merit.

### Treating Physician Rule

Plaintiff also argues the ALJ improperly evaluated the opinions of Drs. Holbrook, Lester, Cruz, Konieczny, House, and Waddell. (Doc. 16, at 20-27; Doc. 16-1, at 1). This argument gives rise to the well-known treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Importantly, the ALJ must give "good reasons" for the weight given to a treating

physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. 20 C.F.R. §§ 404.1502, 416.927. This includes a consultative examiner. *Id.* When determining what weight to give examining sources the same factors that are considered for treating physicians must be considered including the supportability of the opinion and the consistency of the opinion with the record as a whole. *Id.*

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. §§ 404.1502, 416.927. This includes state agency physicians and psychologists. *Id.* The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. 20 C.F.R. § 404.1527(e)(2)(ii).

<u>Drs. Holbrook, Lester, and Cruz</u>

As stated above, the ALJ disregarded the opinions provided by Drs. Lester and Holbrook because of the Special Determination by the agency that similar fault had occurred. (Tr. 16). This Determination found that Plaintiff had knowingly concealed and provided incorrect information concerning her intelligence, her vision, and her ability to function on a daily basis. (Tr. 251).

29

Medical evidence had shown Plaintiff's left eye vision had been 20/40 with best correction months after Dr. Lester had found Plaintiff's vision was 20/100 at the state agency consultative exam. (Tr. 251, 405). Further, Plaintiff had not had difficulty seeing testing materials during her intelligence tests. (Tr. 251). Thus, the ALJ discounted the opinions based on their inconsistency with the record as a whole and total lack of supportability.

With respect to Dr. Cruz, the ALJ assigned her opinion some weight because she did not examine Plaintiff and only reviewed Plaintiff's file shortly after the Special Determination and thus she had before her, the same conflicting information as the other doctors. (Tr. 484). Plaintiff argues specifically that the ALJ erred in disregarding Dr. Cruz's finding, that there is not enough evidence to evaluate Plaintiff's vision impairment since the ALJ "is not a doctor and cannot cavalierly disregard Cruz's opinion." (Tr. 16); (Doc. 16, at 21).  As explained above, the ALJ complied with his duty to develop the record and there was sufficient evidence to make a finding as to Plaintiff's disability. Therefore, the ALJ's decision to give some weight to Dr. Cruz's opinion is supported by the requisite good reasons.

<u>Drs. Konieczy, House, and Waddell</u>

The ALJ afforded no weight to Dr. House's and Dr. Konieczny's opinions due to the agency guidelines and the Special Determination. (Tr. 16).  This Determination provided that the IQ testing by the psychologists' likely did not provide an actual assessment of Plaintiff's abilities because drug use and her motivation were called into question during the tests, Plaintiff had been able to perform semi-skilled work, and despite claiming to have been involved in special education classes in school, Plaintiff had been unable to provide a record of this. (Tr. 251). Despite claiming to hear voices, Plaintiff had never complained of such symptoms to her primary care provider or during emergency room treatment. (Tr. 251). Further, agency investigators had

spoken to Plaintiff and gathered evidence which demonstrated Plaintiff was able to cook, do laundry, leave her home on a daily basis to visit friends and neighbors, running errands, going to the grocery store, and occasionally using a computer.

This weighed against Dr. House's assessment that Plaintiff's ability to maintain concentration, persistence, and pace was markedly limited; her ability to understand, remember and follow instructions was moderately limited; her ability to withstand stress and pressure of day to day work was markedly limited; her ability to relate to others including supervisors and co-workers was markedly limited; her adaptability, insight, and judgment were markedly limited. Likewise, Dr. Konieczny's opinion that Plaintiff had no impairment in her ability to concentrate and attend to task; moderate impairment in her ability to understand and follow directions; marked impairment in her ability to withstand stress and pressure and relate to others; moderate impairment in her awareness of social judgment and conformity; and marked impairment in her overall judgment because these findings were not credible in light of the inconsistencies in Plaintiff's statements and behaviors. (Tr. 418, 425-26).

With respect to Dr. Waddell, Plaintiff appears to be arguing the ALJ should not have disregarded his opinion that there is insufficient evidence. (Doc. 16, at 23, 24). This is the same argument he made for Dr. Cruz and it is not well taken because there was sufficient evidence for the ALJ to make a finding.

### RFC

Plaintiff argues the ALJ erred in his assessment of Plaintiff's RFC because it did not adequately reflect the physical limitations caused by her right eye blindness and left eye weakness and it did not account for the limitations caused by her other diagnoses namely, her personality disorder and her borderline intellectual functioning. (Doc. 16-1, at 1). Specifically,

Plaintiff argues the ALJ erred in finding she had at least a high school education, as well as not including Plaintiff's limitations of reading only at the third grade level, not understanding "big words", and only being able to do a night-time job because Plaintiff's eyes hurt if she goes out in bright sunlight. (Doc. 16-1, at 1-2).

A claimant's RFC is an assessment of "the most [s]he can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.*, at § 416.929. An ALJ must also consider and weigh medical opinions. *Id.*, at § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

With respect to Plaintiff's visual limitations, the ALJ found Plaintiff had no vision in her right eye and functional limitations in her left eye including limited depth perception and limited vision perception. (Tr. 15). As discussed above, although Plaintiff had received vision scores as low as 20/100 in her left eye, she also received visions scores of 20/40 in that eye within the same time frame, thus substantial evidence supports the ALJ's conclusion that while Plaintiff had some functional limits in her left eye, it was largely functional with correction. (Tr. 15, 251, 405). Further, the ALJ adequately accommodated Plaintiff's visual limitations in the RFC by providing for limited depth perception and a limited visual field. (Tr. 15). Plaintiff argues the ALJ should have restricted her only to night-time jobs, however, as the ALJ noted Plaintiff's vision in her left eye was "stable" and Plaintiff was able to easily view a photograph shown to her by detectives despite it being the daytime. (Tr. 16, 240, 390, 496). Therefore, the ALJ's

indication that Plaintiff only had a high school education was harmless and substantial evidence supports the ALJ's determination with respect to Plaintiff's vision capabilities.

With respect to Plaintiff's intellectual capabilities, Plaintiff argues the ALJ erred in providing that Plaintiff had a high school diploma when in fact she never graduated high school. (Doc. 16-1, at 1). Plaintiff is correct; the ALJ did incorrectly indicate Plaintiff had a high school diploma when in fact she did not. (Tr. 17). However, the ALJ's determination of a Plaintiff's education level is subject to a harmless error analysis. *Potter v. Comm'r on Soc. Sec.*, 223 F'Appx 458, 462-63 (6th Cir. 2007) (finding Plaintiff's level of formal education immaterial to whether Plaintiff's mental limitations rendered her disabled).

Here, in questioning the VE, the ALJ did provide for a hypothetical person with less than a high school education in describing Plaintiff's limitations, and the ALJ adopted the VE's opinion of what jobs Plaintiff can perform. (Tr. 18, 48). Further, the ALJ did not rely on this information in determining Plaintiff's intellectual capabilities, therefore this did not affect the ALJ's RFC finding. (Tr. 15-17). Rather, the ALJ discounted Plaintiff's alleged intellectual deficits because Plaintiff was able to articulate clearly, the CDIU report had indicated Plaintiff's intelligence testing was likely not reliable, despite claiming to have been in Special Education classes, Plaintiff had not been able to provide evidence of it, and there was simply no prior evidence in the record which indicated Plaintiff had an intellectual disability prior to her being diagnosed by the consultative examiners. (Tr. 16, 251). Therefore, substantial evidence supported the ALJ's decision not to include any specific intellectual limitations such as only having the ability to read at a third grade level or difficulty not understanding "big words".

Plaintiff also asserts the ALJ did not properly accommodate her borderline personality disorder and her chronic depressive symptoms. (Doc. 16-1, at 1-3). However, as the ALJ notes,

Plaintiff's personality disorder was diagnosed by Dr. Konieczny during May 2011, and was not diagnosed by Dr. House during his exam four months prior. (Tr. 16, 418, 425-26). Although Plaintiff reported hearing voices, she also reported being a heavy drinker and marijuana user. (Tr. 16, 522). Moreover, the CDIU report found Plaintiff had knowingly concealed or provided false information during her psychological examinations, thus Plaintiff's statements about chronic depression and frequent headaches were unreliable and inconsistent with the record. (Tr. 16-17, 251). Further, evidence from the investigators showed Plaintiff was able to perform activities of daily living such as household chores or using a computer. (Tr. 16-17, 251). Moreover, the ALJ's RFC provided Plaintiff could never climb ropes, ladders, or scaffolds, could only perform simple routine tasks, and could only perform low stress work, with no high production quotas, piece rate work, work involving arbitration, confrontation, or negotiation, or work involving anything besides superficial contact with the general public for a specific purpose or short duration, thereby accommodating Plaintiff's symptoms. (Tr. 15).

In sum, the ALJ accurately accommodated all of Plaintiff's symptoms that were based on objective medical evidence and substantial evidence supported disregarding much of the record because of inconsistencies and the finding of similar fault. Plaintiff's argument that the ALJ erred in forming her RFC is not well-taken.

### ALJ's Step-Five Finding

Plaintiff argues the ALJ erred concluding:

Plaintiff could do the jobs of: laundry worker. . .wire worker. . .and electronics worker. . . The ALJ failed to consider the effects of personality disorder and the effects of sunlight or bright lights on the plaintiff's vision impairments when deciding what jobs she could do. Furthermore, the ALJ failed to consider Dr. Konienczny's workplace impairments when designing jobs she might perform. Finally, the ALJ also failed to consider "being off task 20% of the day"; or blacking out twice a week; or missing 2 days per month based upon depression or other problems when considering if there were any jobs she could do [Tr 48-50].

> Since there are so few of those 3 named jobs in Northeast Ohio, we also question how many employers would hire or keep Mrs. Robinson given her serious impairments?

(Doc. 16-1, at 3) (alteration in original).

At step five, the Commissioner has the burden to show, considering a claimant's age, education, and work experience that jobs exist in significant numbers in the national economy which claimant can perform. 20 C.F.R. § 416.969; *Hall v. Bowen*, 837 F.2d 272, 272 (6th Cir. 1988). Under the Regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 416.966(a). There is no bright-line boundary separating a "significant number" from an insignificant numbers of jobs. *Hall*, 837 F.2d at 275 (6th Cir. 1988).

A reviewing court should "consider many criteria in determining whether work exists in significant numbers" including "the level of the claimant's disability[,] the reliability of the [VE's] testimony[,] the reliability of the claimant's testimony[,] the distance claimant is capable of travelling to engage in the assigned work[,] the isolated nature of the jobs[,] the types and availability of such work, and so on." *Id*. Here, based on Plaintiff's age, education, work experience, and RFC, the ALJ determined that for the positions of laundry worker, wire worker, and electronics worker, there are a combined 345,000 jobs nationally and 2,400 jobs regionally. (Tr. 46).

In this case, the *Hall* factors weigh against Plaintiff's argument. First, the ALJ's RFC determination limiting Plaintiff to a range of medium work with specific additional limitations is supported by substantial evidence, as explained above. Plaintiff argues there are "so few" of the named jobs in Northeast Ohio that it's questionable how many of those employers would hire her. (Doc. 16-1, at 3). There is no "special number which is to be the boundary between a

'significant number' and an insignificant number of jobs." *Hall*, 837 F.2d at 275. *Hall* established a number of criteria a judge should consider in determining whether work exists in significant numbers, but the ALJ need not explicitly consider each factor. *Id.*; *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999). Further, "the test is whether work exists in the national economy, not in the plaintiff's neighborhood", and "[t]he Commissioner is not required to show that job opportunities exist within the local area." *Id.* (citing *Dressel v. Califano*, 558 F.2d 504, 508--09 (8th Cir. 1977)); *see also Phillips v. Astrue*, 2011 WL 5526079, *11 (N.D. Ohio 2011) ("Plaintiff's contention that the VE should have provided numbers of jobs in the local economy lacks merit . . . ."); *Rosado v. Comm'r of Soc. Sec.*, 2011 WL 5434087, *4 (N.D. Ohio 2011) (relying on national numbers absent an indication that jobs are concentrated in a few areas). And the Sixth Circuit has found as few as 125 jobs in a local geographic area and 400,000 jobs nationwide constituted significant jobs. *Stewart v. Sullivan*, 1990 WL 75248, *4 (6th Cir. 1990).

Here, Plaintiff's attorney questioned the VE about how her testimony would hold up in light of different hypotheticals, he did not object to any of the positions identified by the VE nor did he identify any conflict between the relevant positions and the DOT. (Tr. 44-54). Moreover, it is not evident to this Court how 2,400 jobs available in the region is insufficient. In short, the ALJ's step five determination is supported by substantial evidence.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

   s/James R. Knepp II
United States Magistrate Judge

36

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).